UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-20026-CR-WILLIAMS/SIMONTON

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.

**WENQIANG BIAN,**

    Defendant.

_____/

**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS**

    **Presently pending before this Court is Defendant Wenqiang Bian's Motion to Suppress Evidence Derived From Illegal Search and Seizure, ECF No. [53].** This motion was referred to the undersigned Magistrate Judge by the Honorable Kathleen M. Williams, United States District Judge, ECF No. [55]. The Government filed a response in opposition, ECF No. [62]. An evidentiary hearing was held on April 13, 2016. At the conclusion of the hearing, the undersigned orally announced her Findings of Fact and Conclusions of Law. This Report and Recommendation sets forth and elaborates upon those determinations. For the reasons set forth below, the undersigned RECOMMENDS that the Motion be DENIED.

    I.    **INTRODUCTION**

    Defendant Wenqiang Bian and co-defendants An Xing Liang and Zhihong Fan are charged in a seven-count Indictment with various offenses related to the use of counterfeit credit cards between approximately December 18, 2015 and January 6, 2016. Specifically, Defendant Bian is charged in four counts of the Indictment with committing the following offenses: conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1029(b)(2) (Count 1); knowingly and with intent to defraud, producing, using and

trafficking in counterfeit credit cards encoded with unauthorized account numbers, in violation of 18 U.S.C. §§ 1029(a)(1) and (2) (Count 4); knowingly and with intent to defraud, possessing device-making equipment, specifically two credit card embossing machines and one credit card tipping machine, in violation of 18 U.S.C. § 1029(a)(4) and (2) (Count 5); and, aggravated identity theft based upon knowingly transferring, possessing and using without lawful authority a specified credit card account number assigned to "J.R.," during and in relation to the offense charged in Count 4 of the Indictment, in violation of 18 U.S.C. § 1028A(a)(1) (Count 7).

The investigation which led to the above charges began on January 2, 2016, when all three defendants were arrested at Aventura Mall following a stop of the cars they were in, based on information regarding the suspected use of counterfeit credit cards to make purchases inside the Mall. The evidence that is the subject of the presently pending Motion to Suppress was seized on January 2, 2016, from a Yukon being driven by Defendant Bian, and a Corvette being driven by co-defendant Liang with co-defendant Fan as a passenger; and was seized pursuant to a search warrant on January 6, 2016, from the Defendant's hotel room.

## II.   THE MOTION TO SUPPRESS

Defendant Bian contends that the stop of the two vehicles was not supported by reasonable suspicion to believe that the occupants had engaged in criminal activity. Therefore, he contends that the stops were unconstitutional and all evidence that flowed from the stops must be suppressed as fruit of the poisonous tree. In addition, he contends that the search warrant issued for the search of his hotel room was predicated upon the evidence unlawfully seized from the vehicles, and therefore that evidence must also be suppressed. At the hearing, Defendant Bian reiterated that his only challenge to the evidence seized from the cars was to the constitutionality of the stops, and that if the

Court found reasonable suspicion to support the stops, he did not challenge the subsequent searches.

In response, the Government asserts that Defendant Bian did not have a reasonable expectation of privacy in the Yukon he was driving since the Yukon was a rental car that he did not rent and was not authorized to drive.  The Government also asserts that Defendant Bian did not have a reasonable expectation of privacy in the Corvette occupied by his co-defendants since he did not own the Corvette, had not rented it, was not driving it, and was not a passenger in it at the time of the search.  The Government argues, therefore, that Defendant Bian does not have standing to challenge the search of either car.[1]  In addition, the Government argues that the stop of both the Yukon being driven by Defendant Bian, and the Corvette being driven by his co-defendants, was based on reasonable suspicion of criminal activity, and therefore was constitutional.[2]

### III.    FINDINGS OF FACT

#### A.    Introduction

The Defendant testified on his own behalf to support his position that he had standing to challenge the stops and searches of both the Yukon and the Corvette.  He also introduced into evidence receipts of purchases made at World Phone and Louis Vuitton to establish a timeline of events, and a recording of a conversation between the Aventura Police Department and mall Security Officer Valdes.  The Government relied upon the testimony of Detective Kenneth Sealy of the Aventura Police Department, and

---

[1]  At the hearing, the Government abandoned its contention that even if the stop of the Yukon was illegal, the Defendant could not challenge the ensuing search of the Yukon since he did not have a reasonable expectation of privacy in the Yukon.  The Government recognized that the search would be the fruits of the stop.

[2]  At the hearing, the Government abandoned its reliance on the good faith exception to the exclusionary rule established by *United States v. Leon*, 468 U.S. 897 (1984).  The Government conceded that if the stops were not supported by reasonable suspicion, then all fruits of those stops must be suppressed.

introduced into evidence various exhibits regarding the rental of the two cars, items seized, and the towing of the vehicles.[3]  The undersigned credits the testimony of the Defendant regarding the circumstances under which the cars were rented from Alamo, which was not contradicted by the Government.  The undersigned credits the testimony of Detective Sealy regarding the observations made at the mall and the circumstances under which the stops of the cars were made.  To the extent that the testimony of the Defendant differs from Detective Sealy regarding the events that occurred in the mall parking lot preceding the stops, the undersigned credits the testimony of Detective Sealy, which was supported by the narration of events on the recording introduced into evidence by the defense.[4]  This credibility determination is based on the demeanor of Detective Sealy, his ability to recall events, and his forthrightness in answering questions.  Detective Sealy is one of the most credible witnesses the undersigned has observed.

    B.    <u>The Car Rentals</u>

The GMC Yukon was rented from Alamo Rent-A-Car on January 1, 2016, at 10:40 p.m. by a person identified on the rental agreement as Yi Li (GX 1).  Defendant Bian did not sign this rental agreement.

The Corvette was rented from Alamo Rent-A-Car on January 2, 2016, at 11:18 a.m. in the name of Yi Wu (GX2).  Defendant Bian testified that "another person" had used that name to obtain the car, and that he had driven that car off the rental lot to Aventura

---

[3] Government exhibits are designated by "GX" followed by the exhibit number, and defense exhibits are designated by "DX" followed by the exhibit number.

[4] Defendant Bian testified that he did not have a good memory of the events that occurred in the mall parking lot.  To the extent that the Defendant relies on the communication between the mall security officer and the Aventura Police Department to impeach the testimony of Detective Sealy regarding information he had received concerning credit card fraud at World Phone, the undersigned relies on the testimony of Detective Sealy.  There is no evidence regarding the basis of knowledge of the mall security officer, and the fact that the mall security officer did not have certain information does not discredit the testimony of Detective Sealy.

shopping mall based on the direction of co-defendant Fan.  Defendant Bian testified that he had not initialed the rental form, but he admitted that he used a false driver's license in the name of Yi Wu to rent the car (GX2).

Based upon the above testimony, the undersigned finds that Defendant Bian used a false driver's license in the name of Yi Wu, as well as a credit card in that name, to obtain the rental of the Corvette from Alamo, and that he drove the Corvette off the rental car lot.  The rental car was initially reserved by another person, whom Defendant Bian did not identify.

      C.    <u>The Circumstances Surrounding the Stop of the Cars</u>

Detective Kenneth Sealy is employed by the Aventura Police Department, and is assigned to the General Investigations Unit.  He is also assigned to the IRS Identity Fraud Task Force, and specializes in crimes related to identity fraud.  On January 2, 2016, Detective Sealy was working an off duty detail at the Aventura Mall.  He wore a police uniform and his duties included assisting mall security with incidents at the mall.  As such, he monitored the radio transmissions from the mall security radio frequency.

At approximately 2:30 p.m., he was at the food court area, and heard a call to be on the lookout for two Asian males due to a report from the World Phone kiosk that they had used fraudulent credit cards.  The credit card receipts reflect that one of the purchases was made at 2:39 p.m., and the second purchase was made at 2:46 p.m.; therefore, the undersigned finds that the BOLO occurred shortly after 2:46 p.m.  The Asian males were described as having black hair, wearing white shirts, and one wore dark pants and the other wore black pants.[5]  They had each presented a credit card where the chips did not work, and the employee believed the cards were fraudulent even

---

[5] Detective Sealy testified that it is not unusual for Asian males to shop at Aventura mall.

though the transactions were approved when the cards were swiped.[6]  Detective Sealy was aware that World Phone was a frequent victim of credit card fraud, and that the mere fact that a transaction is successfully processed does not mean that the credit card is legitimate; in the experience of Detective Sealy, many fraudulent credit card transactions have been successfully processed.  Detective Sealy did not respond to that BOLO because, at the time, he was involved with some shoplifting suspects.  Approximately thirty minutes to an hour later, Detective Sealy was advised that two males who matched the description had been seen entering a black GMC SUV parked just outside the mall doors next to Louis Vuitton.  The receipts later seized by the police reflect that a purchase had been made at Louis Vuitton at 3:32 p.m.  Therefore, the undersigned finds that the time between the World Phone purchases and the time the Asian males were seen leaving the mall was approximately 45 minutes.  Detective Sealy did not immediately respond to this transmission because he was at the opposite side of the mall and did not believe he could arrive at that location before the GMC left the parking lot.  He told mall security to obtain the license plate number of the GMC.  Another transmission stated that the GMC was driving up and down the aisles of the parking lot.  He then received a transmission that the GMC had met a Chevy Corvette and that the occupants of the two vehicles had switched cars.  At that time, based upon his experience with the activities of groups engaged in fraud, Detective Sealy proceeded to the parking lot.  Based upon his investigative experience, he was aware that groups involved in committing fraud at the mall had a *modus operandi*, of exiting the mall, entering a vehicle and driving around to see if law enforcement is watching the vehicle.  Many times, the individuals who have obtained the merchandise will split up, and go in different directions so that it is harder to follow them; in addition, the person who

---

[6]  The employee noticed certain specific aspects of the appearance of the cards that also appeared fraudulent, but this specific information was not relayed to Detective Sealy.

completed the transaction will frequently give the merchandise to a person not involved in the actual transaction so that if mall security officers follow the merchandise and stop the individual in possession of it, they are not likely to be arrested or convicted since they can claim they didn't know it was fraudulently obtained. This enables the person who conducted the fraudulent transaction to avoid apprehension.

Detective Sealy drove to the parking lot where the Corvette and Yukon were observed by mall security. At that time, he saw the white Chevy Corvette with the top down, and two males with black hair inside the vehicle driving in one of the aisles. He also saw the black Yukon driving down one of the aisles, headed toward Perimeter Road, which is the main road that goes around the entire mall. Detective Sealy decided to stop the vehicles for further investigation based on the following facts. He was aware that the World Phone kiosk had been the victim of a significant amount of fraud and that its employees had dealt with and handled counterfeit credit cards on numerous occasions. The Corvette and the Yukon had driven up and down the aisles of the parking lot for at least three minutes, which was the amount of time it took Detective Sealy to arrive at that location. He knew that the occupants of the two vehicles had switched cars. The fact that the top was down on the Corvette, which was occupied by the persons matching the description of the persons who had presented the credit cards at World Phone, led him to suspect that they were possibly trying to draw attention to themselves so that the GMC Yukon which held the merchandise could escape.

Detective Sealy initially stopped the Corvette, and Officer Williams arrived at the same time and stayed on the passenger side of the Corvette to assist. Detective Sealy then saw that the black GMC Yukon had stopped just short of a stop sign at one of the aisles. Another vehicle pulled behind the Yukon, but the Yukon still did not move. The Yukon then rolled up to the stop sign, but did not pull onto the road despite gaps in the traffic that would have allowed it to do so. At that point, Officer Rivas arrived at the area,

7

and Detective Sealy pointed at the Yukon and directed Officer Rivas to stop the Yukon. As Detective Rivas began to reverse his car so that he could make the stop, the Yukon moved forward so that it could enter Perimeter Road; and, once it entered Perimeter Road it began to accelerate. Officer Rivas then pulled behind the Yukon and made the stop.

With respect to the Corvette, Officer Williams asked the passenger for identification, and the passenger, later identified as Co-Defendant Fan, replied in English that he did not consent to a search. Officer Williams responded that he was not asking for consent to search, that he wanted to see identification. Fan again responded that he did not consent to a search. The driver of the Corvette was Co-Defendant Liang. Detective Sealy asked for his driver's license, and Co-Defendant Liang produced a valid California driver's license. Mr. Liang produced one page of the Alamo rental contract for the Corvette, and told Detective Sealy that a friend of his had rented the car. This friend was not identified, but Mr. Liang said that it was not the passenger of the Corvette.

Detective Sealy then contacted Officer Rivas and learned that Officer Rivas had stopped the Yukon. Officer Rivas advised him that the Yukon had been rented from Alamo, and that the name of the driver of the vehicle did not match the rental contract. Detective Sealy and Officer Rivas then called Alamo and told the Alamo representative that the identification provided by the drivers did not match the rental contracts, and that they wanted to determine if those persons were authorized drivers. Alamo stated that they were not authorized drivers. Detective Sealy asked Alamo if they wanted the vehicles released to the drivers, and Alamo stated that they did not want the vehicles released, and requested that the vehicles be towed. Detective Sealy advised Alamo that if they towed the vehicles, the police department's policy was to inventory the vehicles,

and Alamo agreed to that procedure.[7]  Alamo asked for the information regarding the towing company, and stated that they would make arrangements to retrieve the cars from the towing company.

### IV. LEGAL ANALSYIS AND CONCLUSIONS OF LAW

#### A. Framework for Analysis

##### 1. Standing to Challenge the Stop and Search of a Car

It is well-established that a defendant challenging a search or seizure on the grounds that it violates the Fourth Amendment must establish that his own rights were infringed by the challenged government actions.  This is frequently referred to by using the shorthand terminology of "standing."  It is also well-settled that a mere passenger in a car does not have a reasonable expectation of privacy in that car and therefore does not have standing to challenge a search of that car.  *Rakas v. Illinois*, 439 U.S. 128 (1978). In addition, the determination of whether a driver has standing to challenge the search of a car he does not own depends on the circumstances under which he became the driver. *See, e.g., United States v. Gibson*, 708 F.3d 1256, 1277 (11th Cir. 2013) (defendant who paid for insurance and maintenance of car and often drove it did not have standing to challenge search where he was not owner of car, did not have exclusive custody and control of car, and was neither driver nor passenger in car at time of search); *United States v. Cooper*, 133 F.3d 1394, 1398-1402 (11th Cir. 1998) (driver/renter of overdue rental car had standing to challenge search of car); *United States v. Miller*, 821 F.2d 546, 548 (11th Cir. 1987) (driver who borrowed car from friend had standing).  As described by the Court in *United States v. Walton*, 763 F.3d 665 (7th Cir. 2014), the determination of whether a person has standing to challenge the search of a car is based on the totality of

---

[7]  A copy of the towing policy of the Aventura Police Department was admitted as GX 7. There is no challenge to the decision to tow the cars or conduct inventory searches prior to towing, other than as fruit of the allegedly illegal car stops.

9

the circumstances, and includes such factors as ownership, possession and/or control, historical use of the car, and the ability to regulate access.[8]

In *United States v. Alexis*, ___F. Supp. 3d ___, No. 15-20998-CR-Middlebrooks, 2016 WL 1060312 (S.D. Fla. Mar. 11, 2016), following an extensive analysis of the caselaw, the Court held that the driver of a rental car, who had a suspended license and was not an authorized driver of the rental vehicle, did not have an objectively reasonable expectation of privacy in that car, despite the fact that the renter and authorized driver of the car had given defendant permission to use the car. The Court distinguished this situation from that of a lessee who has overstayed the lease agreement, and reasoned that there was no relationship between the driver and the car rental agency, and that the lack of a cognizable property interest in the rental car made it objectively unreasonable for an unauthorized driver to expect privacy in the vehicle. In this regard, the Court noted that the use of a rental car by an unauthorized driver was akin to a person driving a stolen vehicle, as to which numerous appellate courts have held the possessor lacks standing to challenge a search. *See United States v. White*, 504 F. App'x 168, 172 (3d Cir. 2012). The analysis of the Court in *Alexis* is persuasive, and is adopted in this Report and Recommendation.

A person who is detained by the police can challenge the legality of the stop, however, whether he is on foot or a passenger in a car at the time of the stop. *Terry v. Ohio*, 392 U.S. 1 (1968); *Brendlin v.* California, 551 U.S. 249 (2007). It follows that, as conceded by the Government during the evidentiary hearing in the case at bar, if the stop of an automobile is illegal, the fruits of that illegal stop must be excluded from evidence

---

[8] Recently, in *United States v. Jones*, 132 S. Ct. 945, 949 n.2 (2012), the United States Supreme Court implicitly recognized the uncertainty of the contours of the boundary between standing and lack of standing by expressly noting that, based upon the government's failure to challenge the issue, it did not consider the Fourth Amendment significance of a driver's status as the exclusive driver of a car registered solely to his wife.

regardless of the passenger's standing to otherwise contest the search of the car. *See, e.g., United States v. Kimball*, 25 F.3d 1, 5-6 (1st Cir. 1994) (if initial stop of vehicle is illegal, passenger may seek suppression of evidence seized from the stop under the "fruit of the poisonous tree" doctrine of *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)); *United States v. Lawson,* 782 F. Supp. 1546 (S.D. Fla. 1992) (passenger had standing to challenge legality of stop); *United States v. Grant*, 822 F. Supp. 1270 (W.D. Tenn. 1993) (passenger in automobile was illegally seized when car was stopped by police without reasonable suspicion, and therefore evidence seized from the car had to be suppressed as fruit of the illegal seizure) ; *United States v. Wehrle*, No. CR406-333, 2007 WL 521882 (S.D. Ga. Feb. 14, 2007) (passenger of car had standing to seek suppression of evidence seized from car which he claimed was fruit of an illegal stop).

### 2. The Investigative Stop of a Car

In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court established that a law enforcement officer who has a reasonable and articulable suspicion that criminal activity is afoot is permitted to conduct a brief investigatory stop even in the absence of probable cause. This rule applies to investigative stops of automobiles as well as persons on foot. *United States v. Sharpe*, 470 U.S. 675, 682-83 (1985). In *United States v. Arvizu*, 534 U.S. 266 (2002), the United States Supreme Court addressed the parameters surrounding the determination of reasonable suspicion with respect to the decision to make a *Terry*-type investigative stop of a car. The Court emphasized that the existence of a "particularized and objective basis" to support a car stop must be based upon the totality of the circumstances which "allows officers to draw upon their own experience and specialized training," and that although a "mere hunch" is insufficient, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." 534 U.S. at 273-74. The Court reiterated the longstanding principle that even though each

of the acts relied upon to support the existence of reasonable suspicion may be susceptible of innocent interpretation, they may collectively amount to reasonable suspicion based upon the experience of the officer. *Id.*

The quantum of evidence necessary to detain a person under circumstances similar to the case at bar is fact intensive and has been discussed in various cases. For example, in *United States v. Adams*, 39 F.3d 1178 (4th Cir. 1994), the defendant was stopped based on information from a bank's credit card department. The bank manager at this branch (the Ashland Branch) had received information from another bank that several black men with Jamaican accents had attempted to obtain a large cash advance on a NationsBank Visa card, and the "suspicion was that the men were trying to obtain the money illegally." *Id.* at 2. Shortly thereafter, a black man with a Jamaican accent approached a teller at the Ashland branch and requested a cash advance on a NationsBank Visa card in the same name. The manager saw a car in the parking lot that matched the description of the car used at the other bank, with two black males inside. The manager called the police and told them that someone possibly involved in a credit card fraud was in the bank. The teller told her customer that it would take a few minutes to obtain authorization, at which point the man said that he did not want to wait, and left. The manager then advised the police that the man had left, and provided a description of the car as a grey Maxima, stating that it had an out-of-state tag. Approximately five minutes later, the police saw a car matching that description traveling on I-95, and stopped that car. The Court held that the officers had reasonable suspicion of criminal activity to stop the car based on the fact they had been informed of a possible credit card fraud at a bank, and that the suspects were traveling in a grey Maxima with out-of-state tags.

The Court reached the same result in *United States v. Lee*, 317 F.3d 26 (1st Cir. 2003), holding that police officers had reasonable suspicion to support the *Terry* stop of

12

a car where a store manager reported to the police that a young Asian male had tried, but failed, to purchase a $2,300 watch using two American Express cards; and, that when the attempt failed, that male hurriedly left the store and headed toward the parking lot with another Asian male who was wearing a green shirt and light-colored pants.  The police arrived at the parking lot and saw a white van containing two men who matched the description of the suspects.  The van tried to pull forward when the officer approached, but the way was obstructed, and so the van then was put into reverse and backed up, almost hitting the patrol car.  At that point, the officer stopped the progress of the van by blocking its path, drawing his firearm, and turning on his blue lights.  In upholding the validity of the stop, the Court stated that the police were entitled to rely on the information provided by the store manager, and based upon that information and the observations in the parking lot, draw the inference that the occupants of the car "might be involved in the reported credit card fraud." *Id.* at 31*.*  The Court emphasized that "police officers ordinarily may employ minimally intrusive measures to effectuate legitimate investigatory purposes." *Id.*

      Similarly, in *United States v. Wilson*, 510 F. App'x 339 (5th Cir. 2013), the Court upheld a *Terry* stop based upon information from a store clerk that a person had attempted to purchase a gift card, and then left when the store clerk left the register area to obtain permission from the manager for the gift card purchase since it exceeded $200.00.  The store manager saw her walk out of the store at "a little quick pace," while talking on a cell phone, and then saw her enter a vehicle that "sped off."  Approximately one or two months earlier, the store had been the victim of a fraudulent credit card purchase of two gift cards.  The woman who left the store resembled the woman who had made the previous fraudulent purchase.  The store manager then called the police to report this suspicious incident, and gave a description of the car as well as the direction in which it had traveled.  Within five minutes after receiving this information, a few miles

away from the store, the police officer stopped a vehicle that matched the description. The Court held that based upon the information provided by the store manager, the initial stop of the car was based on specific and articulable facts that gave rise to reasonable suspicion of criminal activity, and therefore was permissible under the Fourth Amendment.

Thus, as long as there are specific and articulable facts that support an objectively reasonable belief that there is criminal activity afoot, the police are justified in stopping a car for further investigation.

      B.    **Conclusions of Law**

**1. No Fourth Amendment right of the Defendant was violated by the stop of the Corvette, and therefore he does not have standing to challenge that stop.**

Accepting the Defendant's testimony as true, the arrangements for the rental of the Corvette were made by someone other than himself. When he arrived at the Alamo Rent-A-Car location, the rental was paid through the use of a credit card in the name of "Yi Wu," and Defendant Bian took possession of the Corvette by presenting a fraudulent driver's license in the name of "Yi Wu." Defendant Bian was not present in the Corvette at the time it was stopped by Officer Sealy.

Although counsel for Defendant Bian contended at the evidentiary hearing that Defendant Bian's right to be free from an unreasonable seizure was violated by the stop of the Corvette, he admitted that he could not identify any personal interest that was violated by the stop of that car; nor can the Court identify any such personal interest. Therefore, since no rights of Defendant Bian were violated by the stop, he cannot seek suppression of any evidence based upon a challenge to the legality of that stop. Since Defendant Bian has challenged the subsequent search of the Corvette only on the basis that it was the fruit of an illegal stop, the Motion to Suppress must be denied with respect to the evidence gathered as a result of the stop and search of the Corvette.

Moreover, under the rationale of *Alexis*, Defendant Bian had no reasonable expectation of privacy in the Corvette. He took possession of the Corvette using a false identity, and drove it for only a short distance until parking it in the vicinity of Aventura Mall. He then retrieved the car and drove it into the Aventura Mall parking lot, where he turned it over to co-defendants Fan and Liang and took possession of the GMC Yukon. Under these circumstances, the fact that Defendant Bian took possession of the car by fraudulent pretenses, combined with his brief possession of the Corvette, dictate the conclusion that he had no reasonable expectation of privacy in the Corvette.

**2. The stop of the Corvette was based on reasonable suspicion of criminal activity, and therefore did not violate the Defendant's Fourth Amendment rights.**

Detective Sealy was permitted to rely on the information supplied by the World Phone employees and Aventura Mall security officers in deciding to stop the Corvette to investigate suspected criminal activity. He knew that World Phone was a frequent victim of fraudulent credit card purchases, and that the employees of World Phone therefore had some experience in spotting such activity. The fact that neither of the chips in the two credit cards used by the two customers worked, coupled with the statement by the employee that he suspected the cards were fraudulent, combined with the suspicious parking lot observations where the Yukon left a prime parking space and travelled up and down the aisles of the parking lot, and the car-swapping activity between the occupants of the Yukon and the Corvette, provided the "particularized and objective" basis to support the car stop. Detective Sealy was an experienced investigator with respect to the use of fraudulent credit cards and identity theft, and the activities in the parking lot were consistent with persons who had fraudulently purchased merchandise and were trying to limit their exposure to criminal charges. As in *Adams*, *Lee,* and *Wilson*, the information known to Officer Sealy, combined with his experience, was far more than just

a "mere hunch" and provided ample basis for him to stop the cars involved for at least a brief investigation.[9]

**3. The stop of the GMC Yukon was based on reasonable suspicion of criminal activity, and therefore did not violate the Defendant's Fourth Amendment rights.**

For the same reasons that the stop of the Corvette was permissible since it was supported by an objectively reasonable suspicion of criminal activity, the stop of the Yukon was also permissible.  In fact, there was additional suspicious activity on the part of the Yukon based upon the fact that before it was stopped by Officer Rivas, the Yukon had stopped at a stop sign but did not move forward when there was an opportunity to do so, despite the presence of a car behind it.  It was only after Detective Sealy pointed to the Yukon in connection with his request for Officer Rivas to stop the Yukon, and Officer Rivas started to backup so that he could stop the Yukon that the Defendant drove onto Perimeter Road and began to accelerate away from the area.  Although these might be innocent events when viewed in isolation, when combined with the other facts, these actions heighten the suspicion of criminal activity.  Therefore, the stop of the GMC Yukon being driven by the Defendant did not violate the Fourth Amendment.

### V.   CONCLUSION

Therefore, based upon the above Findings of Fact and Conclusions of Law, since the car stops were constitutionally valid, and there were no fruits of an illegal stop, it is hereby

RECOMMENDED that the Defendant's Motion to Suppress, ECF No. [53] be DENIED.

---

[9] In reaching this result the undersigned has considered the arguments of defense counsel that there was no certainty that credit card fraud had been committed, that the description of the suspects as Asian males wearing white shirts and black/dark pants was general, and that 45 minutes had elapsed from the time of the suspected fraudulent purchase.  These factors, while consistent with innocence, do not vitiate the existence of reasonable suspicion based on the remaining information.  *Arvizu*, 534 U.S. at 273-74.

The parties will have fourteen calendar days from the date of service of this Order, or such other time set by the District Judge, within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned. Pursuant to Fed. R. Crim. P. 59(b), failure to file objections timely waives a party's right to review, and bars the parties from attacking on appeal any legal rulings and factual findings contained herein.  See *Thomas v. Arn*, 474 U.S. 140 (1985).

DONE AND SUBMITTED in chambers at Miami, Florida, on April 29, 2016.

*Andrea M. Simonton*
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished via CM/ECF to:
The Honorable Kathleen M Williams,
   United States District Judge
All counsel of record